159 F.3d 616
 333 U.S.App.D.C. 26, 29 Envtl. L. Rep. 20,252
 GEORGE E. WARREN CORPORATION, Petitioner,
v.
U.S. ENVIRONMENTAL PROTECTION AGENCY and Carol M. Browner,
Administrator, Respondents.
Friends of the Earth, et al., Intervenors.
 Nos. 97-1651 and 97-1656.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 8, 1998.
Decided Nov. 3, 1998.
 
 On Petitions for Review of an Order of the Environmental Protection Agency.
 Jeffrey C. Bates, Boston, MA, argued the cause for petitioner George E. Warren Corporation. With him on the briefs were Harvey M. Sheldon, Chicago, IL, and Ellen S. Tenenbaum, Washington, DC.
 Michael F. McBride argued the cause for petitioner Independent Refiners Coalition. With him on the briefs were Gene E. Godley, Washington, DC and Daniel C. Esty.
 Seth M. Barsky, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief were Lois J. Schiffer, Assistant Attorney General, Washington, DC, Jonathan Z. Cannon, General Counsel, Environmental Protection Agency, and John Hannon, Attorney.
 J. Martin Wagner argued the cause for intervenors Friends of the Earth, Inc., et al. With him on the brief were Patti Goldman, Marcus W. Sisk, Jr. and Lori A. Lange.
 V. Robert Denham, Jr. argued the cause for intervenors Petroleo Brasileiro, S.A., and Petrobras America, Inc. With him on the brief were Rex R. Veal and N. David Palmeter, Washington, DC.
 Before: GINSBURG, SENTELLE, and ROGERS, Circuit Judges.
 GINSBURG, Circuit Judge:
 
 
 1
 Before the court are petitions to review a rule promulgated by the Environmental Protection Agency in 1997 to implement the anti-dumping provision of the reformulated gasoline program established by the Clean Air Act Amendments of 1990. See 42 U.S.C. § 7545(k)(8). The challenged rule regulates emissions from conventional gasoline for motor vehicles, and changes the way importers and foreign refiners of conventional gasoline sold in the United States had been treated under the prior rule. The petitioners are the George E. Warren Corporation, an importer of gasoline, and the Independent Refiners Coalition, a trade organization composed of domestic gasoline refiners. Three environmental pressure groups intervene on behalf of the petitioners, and two foreign refiners intervene on behalf of the EPA.
 
 
 2
 The petitioners and their supporters (hereinafter collectively the petitioners) contend that in promulgating the 1997 rule the EPA acted beyond its statutory authority, arbitrarily and capriciously, and in reliance upon comments submitted after the close of the comment period. For the reasons set out below, we reject each of these challenges and deny the petition for review.
 
 I. Background
 
 3
 The Clean Air Act Amendments of 1990 require the reformulation of conventional gasoline to reduce motor vehicle emissions in certain large urban regions with elevated levels of ozone. See 42 U.S.C. § 7545(k)(1) (nonattainment areas). In those areas reformulated gasoline alone may be sold to consumers; conventional gasoline may be sold in the remainder of the country. See id. § 7545(k)(1), (5).
 
 
 4
 To prevent pollutants being transferred from reformulated gasoline to conventional gasoline in the refining process, the Congress included an "anti-dumping" provision, see id. § 7545(k)(8),* which requires generally that the conventional gasoline of each supplier (including both domestic and foreign refiners and importers) remain as clean as it was in 1990. Compliance is measured for each of several specified pollutants by comparing the yearly average emissions per gallon attributable to each supplier's conventional gasoline with an individual baseline representing the quality of gasoline that supplier introduced into the United States in 1990. If, however, the Administrator of the EPA "determines that no adequate and reliable data exist[]" to set an individual baseline for a particular supplier, then that supplier's compliance is measured against a statutory baseline representing the average emissions per gallon for all gasoline introduced into commerce in 1990. And like it or not, thereby hangs a tale.
 
 A. The 1994 Rule
 
 5
 In 1994 the EPA announced standards for setting individual baselines under which domestic refiners, foreign refiners, and importers were all treated differently. See Final Rule: Regulation of Fuels and Fuel Additives: Standards for Reformulated and Conventional Gasoline, 59 Fed.Reg. 7,716. Domestic refiners were each required to establish an individual baseline because the EPA determined they have adequate and reliable data with which to do so. Foreign refiners were not regulated, but their gasoline was subject to the regulations applicable to the importer thereof. Each importer was permitted to establish an individual baseline, but because they generally lacked the data to do so, importers were in practice assigned the statutory baseline. See id. at 7,785/2-3, 7,786/2.
 
 
 6
 The EPA had considered giving foreign refiners the option of either petitioning to establish an individual baseline or accepting the statutory baseline, but rejected this approach for three reasons. First, foreign refiners generally would not have adequate data with which to establish an individual baseline. Second, the agency was concerned with the potential for "gaming": a foreign refiner presumably would choose to apply for an individual baseline only if doing so would allow the refiner to sell gasoline dirtier than would be allowed under the statutory baseline, which might result in overall degradation of air quality. Finally, the EPA determined that because foreign refiners, unlike domestic refiners, are not "subject to the full panoply of EPA's regulatory jurisdiction," the agency could not impose upon them mechanisms to ensure compliance monitoring and enforcement, functions that it considered "integral to the establishment of accurate and verifiable baselines." Id. at 7,786/2. Because a foreign refiner's gasoline typically passes through many channels and may be blended with gasoline from other refineries before it reaches the United States, and because gasoline cannot be identified by its refinery of origin, the EPA would have only the paperwork accompanying the imported gasoline to identify its source. See id. at 7,787/1-2. The agency also considered requiring each foreign refiner, like each domestic refiner, to establish an individual baseline, but ultimately rejected this mandatory approach for two of the three reasons it rejected the optional approach: most foreign refiners lack the necessary data, and it would be difficult to monitor for and to enforce compliance. See id. at 7,786/1-2.
 
 B. The 1997 Rule
 
 7
 In 1995 the World Trade Organization held the 1994 rule violated the anti-discrimination norm of the General Agreement on Tariffs and Trade because domestic refiners were allowed to set individual baselines while foreign refiners were not. The United States Trade Representative in June 1996 advised the WTO that the United States intended to comply with that decision. See 19 U.S.C. § 3533 (specifying procedures agencies must follow before amending a rule held inconsistent with GATT). The EPA accordingly solicited public comment to identify its choices, see Invitation For Public Comment: World Trade Organization (WTO) Decision on Gasoline Rule (Reformulated and Conventional Gasoline), 61 Fed.Reg. 33,703 (1996), and later proposed to adopt the optional baseline approach it had rejected in the 1994 rule, allowing each foreign refiner either to accept the statutory baseline or to petition the EPA for permission to establish an individual baseline. See Notice of Proposed Rulemaking: Regulation of Fuels and Fuel Additives: Baseline Requirements for Gasoline Produced By Foreign Refiners, 62 Fed.Reg. 24,776 (1997).
 
 
 8
 In 1997 the EPA promulgated a final rule to that effect. See Final Rule: Regulation of Fuels and Fuel Additives: Baseline Requirements for Gasoline Produced By Foreign Refiners, 62 Fed.Reg. 45,533 (codified at 40 C.F.R. pt. 80). The new rule conditions the assignment of an individual baseline upon the foreign refiner's agreement to certain conditions necessary to ensure compliance and to facilitate enforcement. See id. at 45,539-41, 45,550-59. The EPA concluded that the risk of an adverse environmental impact from gaming by foreign refiners, although "difficult to quantify," id. at 45,537/2, was acceptable; indeed, during the first year in which the 1994 rule was in effect imported gasoline on average actually had been somewhat cleaner than required by the statutory baseline. See id. at 45,542/2 & n. 13. Nevertheless, the EPA again acknowledged, as it had in 1994, that allowing foreign refiners selectively to petition for individual baselines could have an adverse environmental effect. Accordingly, as a remedial measure, the agency announced that it will monitor the average quality of imported gasoline for emissions of oxides of nitrogen (NOx)--the pollutants which in its judgment are most likely to increase over 1990 levels--and will compare the results with the average quality of gasoline imported in 1990; if the 1990 levels are ever exceeded, then the permissible levels of NOx for gasoline imported under the statutory baseline will automatically be decreased by an offsetting amount, in order thereby to maintain the "environmental neutrality" of the rule. Id. at 45,537.
 
 II. Analysis
 
 9
 The petitioners bring both substantive and procedural challenges to the 1997 rule. As to substance, the petitioners argue the rule is beyond the EPA's statutory authority because (1) allowing foreign refiners the option to petition the EPA for an individual baseline may result in a degradation of air quality; (2) in promulgating the rule the EPA considered factors other than air quality, namely (a) the WTO's decision that the 1994 rule was inconsistent with the GATT, and (b) the likely effect of regulation upon the price and supply of gasoline in the U.S. market; (3) the EPA may not allow foreign refiners to choose whether to establish an individual baseline but must assign them each one unless it determines with respect to a particular refiner that there are not adequate and reliable data with which to do so; and (4) the remedial provision impermissibly alters the statutory baseline set by the Congress. The petitioners also challenge the agency's reasoning as arbitrary and capricious in several respects. As to procedure, the petitioners challenge the EPA's reliance upon comments filed by the Department of Energy after the close of the period for public comment, and the agency's failure to consider certain factors when fashioning the remedial provision. We address the latter procedural point in conjunction with the petitioners' substantive challenge to the remedial provision, to which it is closely related.
 
 A. Justiciability
 
 10
 Before discussing the merits of this dispute we consider the EPA's two threshold objections to this proceeding. First, the EPA contends the IRC lacks prudential standing because it is not within the zone of interests protected by the Clean Air Act. The agency then concedes, however, that because Warren raises "essentially the same claims as IRC," our holding that the IRC lacks standing would "not reduce the number of issues before the Court." See, e.g., Mountain States Legal Found. v. Glickman, 92 F.3d 1228, 1232 (D.C.Cir.1996) ("For each claim, if constitutional and prudential standing can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise that claim"). Contrary to the EPA's concession, however, we observe that several of the arbitrary and capricious challenges in this case are advanced only by the IRC. We must therefore consider whether the IRC has standing to bring them. See Louisiana Envtl. Action Network v. Browner, 87 F.3d 1379, 1382 (1996) ("before we reach the merits of any claim, we must first assure ourselves that the dispute lies within the constitutional and prudential boundaries of our jurisdiction").
 
 
 11
 As it turns out, however, we find it unnecessary to resolve the question of the IRC's prudential standing because the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604(a) ("any citizen may commence a civil action"), apparently removes that "judicially self-imposed limit[] on the exercise of federal jurisdiction." Bennett v. Spear, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). In the cited case the Court concluded that the Congress had removed the zone-of-interests barrier to suits brought under the Endangered Species Act by including a citizen suit provision that the Court described as follows:
 
 
 12
 The first operative portion of the provision says that "any person may commence a civil suit"--an authorization of remarkable breadth when compared with the language Congress ordinarily uses. Even in some other environmental statutes, Congress has used more restrictive formulations.... Our readiness to take the term "any person" at face value is greatly augmented by two interrelated considerations: that the overall subject matter of this legislation is the environment (a matter in which it is common to think all persons have an interest) and that the obvious purpose of the particular provision in question is to encourage enforcement by so-called "private attorneys general"--evidenced by its elimination of the usual amount-in-controversy and diversity-of-citizenship requirements, its provision for recovery of the costs of litigation (including even expert witness fees), and its reservation to the Government of a right of first refusal to pursue the action initially and a right to intervene later.
 
 
 13
 Id. at 164-65, 117 S.Ct. 1154. The citizen suit provision in the Clean Air Act is indistinguishable, for it contains all of the elements the Court found significant in the corresponding provision of the ESA. See 42 U.S.C. § 7604(a) ("any person may commence a civil action"); id. (eliminating amount-in-controversy and diversity-of-citizenship requirements); § 7604(d) (providing for recovery of costs of litigation, including expert witness fees); § 7604(b)(1)(A) (Administrator must be given right of first refusal); § 7604(c)(2) (Administrator, if not a party, may intervene at any time). Accordingly, we hold the IRC has standing.
 
 
 14
 Second, the EPA claims that Warren's challenge to the remedial provision is unripe because the remedial provision may never be implemented; if ever it is, that will constitute "final action" from which Warren may then appeal. Warren responds with the broad nostrum that under the Clean Air Act "immediate challenge of a regulation is the prudent course." Despite the generality of its response, we agree with Warren that its challenge is ripe.
 
 
 15
 To determine the ripeness of a controversy for judicial review ordinarily requires the court to evaluate "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, ----, 118 S.Ct. 1665, 1670, 140 L.Ed.2d 921 (1998) (quoting Abbott Lab. v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). "In determining the fitness of an issue for judicial review we look to see whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." Clean Air Implementation Project v. EPA, 150 F.3d 1200, 1204 (D.C.Cir.1998). All three criteria are met here: Whether the remedial provision is consistent with the statute is purely an issue of law. That issue is as concrete now as it will ever be because the rule operates automatically to lower the statutory baseline if and when average emissions of NOx from gasoline imported thereunder exceed corresponding 1990 levels; no future factual developments will add to our present understanding of the effect the remedial provision will have upon Warren, when and if it is implemented. Cf. id. at 1205 (contention that EPA's credible evidence rule altered emission standards not fit for review because effects of rule could not be adequately determined prior to its application in concrete factual setting). And the rule is undoubtedly final.
 
 
 16
 Under these circumstances, we need not address the EPA's argument that Warren will suffer no hardship unless and until the remedial provision is implemented. "[W]here the first prong of the [Abbott Laboratories] ripeness test is met and Congress has emphatically declared a preference for immediate review [as it has under the Clean Air Act, 42 U.S.C. § 7607(b) ] ... no purpose is served by proceeding to the second prong." NRDC v. EPA, 22 F.3d 1125, 1133 (D.C.Cir.1994). We conclude, therefore, that Warren's challenge to the rule's remedial provision is ripe for review.
 
 B. Substantive Challenges
 
 17
 Because the EPA is charged with administering the Clean Air Act, we evaluate a challenge to its statutory authority under the familiar two-step analysis of Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). See Motor Vehicle Mfrs. Assoc. v. EPA, 768 F.2d 385, 389 n. 6 (D.C.Cir.1985) (Chevron analysis applies to questions of statutory construction under Clean Air Act). Under Chevron step one the court asks "whether Congress has directly spoken to the precise question at issue," id. at 842, 104 S.Ct. 2778; if so, then we "must give effect to the unambiguously expressed intent of Congress." Id. at 843, 104 S.Ct. 2778. If the Congress has not addressed the issue, however, then under Chevron step two we will defer to the agency's interpretation if it is reasonable in light of the structure and purpose of the statute. See id.
 
 
 18
 We review a challenge to the agency's actions as arbitrary and capricious under the same standards that we apply when reviewing a rule pursuant to the Administrative Procedure Act. See 42 U.S.C. § 7607(d)(9)(A); Chemical Mfrs. Ass'n v. EPA, 28 F.3d 1259, 1263 (D.C.Cir.1994). As we have pointed out before, this inquiry may overlap with our analysis under step two of Chevron, see Republican Nat'l Comm. v. FEC, 76 F.3d 400, 407 (1996); so it does to some extent in this case.
 
 1. Air Quality Improvement
 
 19
 The petitioners base all their challenges to the EPA's statutory authority upon the premise that any rule that does not guarantee the maintenance or improvement of air quality violates the anti-dumping provision of 42 U.S.C. § 7545(k)(8). For this they rely upon our remark in American Petroleum Institute (API) v. EPA, 52 F.3d 1113, 1119 (1995), that the "sole purpose of the [reformulated gasoline] program is to reduce air pollution." In doing so, however, the petitioners misjudge the applicability of that precedent.
 
 
 20
 The overall goal of the reformulated gasoline program is, of course, to improve air quality by reducing air pollution; the means chosen to achieve that end are, first, requiring that only reformulated gasoline be sold in nonattainment areas, see § 7545(k)(1), and second, prohibiting the transfer of pollutants in the refining process from reformulated to conventional gasoline, see § 7545(k)(8). In API the court was interpreting § 7545(k)(1), which sounds the main theme by requiring "the greatest reduction in emissions of [specified pollutants] achievable through the reformulation of conventional gasoline." That interpretation has no application to § 7545(k)(8), which is intended (though for reasons discussed in the next paragraph is not guaranteed) to maintain the emissions per gallon attributable to conventional gasoline at levels no higher than they were in 1990, but does not require that they be reduced. The petitioners thus conflate the overriding statutory purpose of the reformulated gasoline program, which was at issue in API, with an express statutory command applicable to conventional gasoline, which is at issue in this case.
 
 
 21
 Indeed, far from requiring that emissions per gallon of conventional gasoline be reduced--or even capped at 1990 levels, as a bill passed by the House would have done, see S. 1630, 101st Cong. § 212(k)(6) (May 23, 1990), reprinted in SEN. COMM. ON ENV'T & PUB. WORKS, 103D CONG., 2 LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1990, at 2065 (1993)--the anti-dumping scheme as enacted allows such emissions to increase from 1990 levels under certain circumstances. If individual baselines could be established for every supplier, and if the market share of each were to remain at its 1990 level, then of course emissions per gallon also would remain at 1990 levels. Because, however, the data needed to set an individual baseline do not exist for every supplier--a contingency for which the Congress expressly provided, see § 7545(k)(8)(E)--the statute inherently tolerates an increase over 1990 emissions per gallon. While suppliers with an individual baseline must maintain the quality of their gasoline at its 1990 level or better, suppliers operating under the statutory baseline may be providing gasoline that is dirtier than was the corresponding gasoline on the market in 1990. In addition, the market share of the latter group may increase, which would also contribute to a lessening of air quality. In sum, although the general purpose of the antidumping provision is to maintain average emissions per gallon from conventional gasoline at no more than 1990 levels, the specific approach adopted by the Congress makes full achievement of that goal less than certain. This result apparently reflects a legislative compromise between two potentially conflicting goals--avoiding degradation of air quality and not disrupting the market for conventional gasoline. See 136 Cong. Rec. 35,759 (1990) ("There are several dilemmas ... that must be equitably addressed by EPA in implementation of [ § 7545(k)(8)], taking into account costs, fuels, availability and energy penalties to refiners") (statement of Sen. Simpson); id. at 35,002 ("Control over supply means control over price. EPA must be sensitive to this danger: New [ § 7545(k) does] not intend to resurrect a 1970's DOE type scheme of detailed government intervention in U.S. gasoline markets. An approach of this sort would be especially unacceptable, in view of the fact that DOE's restrictions artificially lowered prices, whereas EPA restrictions on supply would artificially raise them") (statement of Rep. Sharp), reprinted in 1 LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1990 at 1164, 1219.
 
 2. Factors Other Than Air Quality
 
 22
 Again proceeding from the mistaken premise that the maintenance or improvement of air quality is the sole focus of the anti-dumping provision, the petitioners argue that the EPA may not consider factors other than air quality in promulgating rules under § 7545(k)(8). Thus do they challenge the EPA's consideration both of the WTO's decision interpreting the GATT and of the comments of the Department of Energy concerning the economic effects of the alternatives before the agency. The DOE predicted that mandating individual baselines for foreign refiners could adversely affect the price and supply of gasoline by making it more difficult for the foreign refiners quickly to divert gasoline to the U.S. market in times of increased demand. See 1997 Rule, 62 Fed.Reg. at 45,536/2. The EPA responds that nothing in the statute precludes consideration of such factors, and that its approach is congruent with that employed by the Congress when it enacted the anti-dumping provision.
 
 
 23
 The petitioners do not direct our attention to anything in the text or structure of the statute to indicate that the Congress intended to preclude the EPA from considering the effects a proposed rule might have upon the price and supply of gasoline and the treaty obligations of the United States. Under step two of Chevron, therefore, we must defer to the agency's construction if it is reasonable. See NRDC v. EPA, 824 F.2d 1146, 1157 (D.C.Cir.1987) (en banc) (interpreting 42 U.S.C. § 7412 of the Clean Air Act and rejecting the view that "as a matter of statutory interpretation, cost and technological feasibility may never be considered under the Clean Air Act unless Congress expressly so provides"); International Bhd. of Teamsters v. United States, 735 F.2d 1525, 1529 (D.C.Cir.1984) ("In the absence of clear congressional direction to the contrary, we will not deprive the agency of the power to fine-tune its regulations to accommodate worthy nonsafety interests" under a statute focused upon safety); see also Grand Canyon Air Tour Coalition v. FAA, 154 F.3d 455, 475 (D.C.Cir.1998) (FAA properly considered effects of rule on air tourism industry where the statute did not forbid such consideration and required not total but only "substantial restoration of the natural quiet").
 
 
 24
 Under step two of Chevron, we think the agency's interpretation is permissible. Section 7545(k)(8) specifically allows foreign refiners that produced dirtier than average gasoline in 1990 to continue importing gasoline of that quality, presumably in order to prevent the disruption that might ensue were those refiners forced to choose between producing cleaner gasoline than they did in 1990 or quitting the U.S. market. The agency, following the lead of the Congress, similarly sought to prevent its rule from disrupting the market.
 
 
 25
 In the particular circumstances of this case our usual reluctance to infer from congressional silence an intention to preclude the agency from considering factors other than those listed in a statute is bolstered by the decision of the WTO lurking in the background. "Since the days of Chief Justice Marshall, the Supreme Court has consistently held that congressional statutes must be construed wherever possible in a manner that will not require the United States 'to violate the law of nations.' " South African Airways v. Dole, 817 F.2d 119, 125 (D.C.Cir.1987) (quoting The Schooner Charming Betsy, 6 U.S. (2 Cranch.) 64, 118, 2 L.Ed. 208 (1804)); see also Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 539, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995) ("If the United States is to be able to gain the benefits of international accords and have a role as a trusted partner in multilateral endeavors, its courts should be most cautious before interpreting its domestic legislation in such manner as to violate international agreements").
 
 
 26
 In sum, we conclude the EPA's consideration of factors other than air quality is not precluded by anything in § 7545(k)(8); in this case, moreover, that consideration appears to be congruent with both the congressional purpose not to disrupt the market for imported gasoline and the Supreme Court's instruction to avoid an interpretation that would put a law of the United States into conflict with a treaty obligation of the United States. For these reasons we deem the EPA's interpretation of the anti-dumping provision a reasonable one; pursuant to Chevron step two, therefore, we must uphold it.
 
 3. Adequate and Reliable Data
 
 27
 The petitioners argue that in § 7545(k)(8)(E) the "Congress provided that the Statutory Baseline was not an option but could be used only if 'the Administrator determines that no adequate and reliable data exist[] regarding the composition of gasoline sold or introduced into commerce by a refiner, blender, or importer in calendar year 1990.' " The EPA does, however, link assignment of the statutory baseline to the unavailability of data with which to set an individual baseline. As we understand the petitioners' argument, therefore, they object to the manner in which the agency makes this determination.
 
 
 28
 Under step one of Chevron, we conclude the Congress did not speak to the precise question at hand: § 7545(k)(8)(E) requires the EPA to determine whether the necessary data are available, but it does not tell the agency how it must go about the task. Nor could counsel for the petitioners say, when asked, what the statute requires the agency to do when a foreign refiner claims it does not have data relevant to establishing an individual baseline. In view of the lack of guidance in the statute concerning how the EPA is to determine whether "adequate and reliable data exist[]" within the meaning of § 7545(k)(8), we proceed to step two of Chevron and examine whether the agency's method of making that determination represents a reasonable construction of the statute.
 
 
 29
 The EPA determined implicitly--but nonetheless clearly--that for the purpose of setting an individual baseline no adequate and reliable data can exist with respect to a foreign refiner unless that refiner agrees to certain conditions, several of which relate directly to the production of information, necessary to ensure compliance with and enforcement of the statute. "[W]e defer to an interpretation which was a necessary presupposition of the [agency's] decision," so long as that interpretation is reasonable. National R.R. Passenger Corp. v. Boston & Maine Corp., 503 U.S. 407, 420, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992). (As in the cited case, it is "noteworthy ... that [no petitioner] contends the [EPA's] decision was not informed and governed by this statutory interpretation." Id.)
 
 
 30
 In the 1994 rulemaking the EPA stated its belief that most foreign refiners lack the data necessary to establish the quality of the (often minor) portion of their 1990 output sold in the United States. See 1994 Rule, 59 Fed.Reg. at 7,786/1-2. As to those refiners that might have the data, the agency explained that such data cannot be deemed "adequate and reliable" unless backed up by appropriate mechanisms for monitoring and enforcing the refiner's compliance with EPA regulations:
 
 
 31
 There is a fundamental distinction between EPA's ability to monitor and enforce regulatory requirements that would apply against domestic as opposed to foreign refiners. Simply put, domestic refiners are subject to the full panoply of EPA's regulatory jurisdiction and compliance monitoring, while not all foreign refiners desiring to produce reformulated and/or conventional gasoline may be subject to EPA's regulatory jurisdiction with equivalent certainty. Compliance monitoring and enforcement are integral to the establishment of accurate and verifiable baselines, as well as subsequent compliance with standards based on these baselines.
 
 
 32
 The reformulated gasoline program compliance monitoring and enforcement scheme consists of several elements designed in the aggregate to ensure that the environmental goals of the Clean Air Act are met, including, inter alia: baseline-setting audits; mandatory reporting and record keeping; independent laboratory sampling and testing; tracking of product from point of production to point of distribution; unannounced EPA compliance inspections; annual attest engagements by certified professionals; and an enforcement scheme comprised of civil penalties, injunctive relief, and criminal sanctions. Domestic refiners and importers are subject to EPA jurisdiction in each of these activities; all foreign refiners may not be equally amenable to EPA jurisdiction.
 
 
 33
 Id. at 7,786/2-3.
 
 
 34
 The 1997 rule addresses these concerns by allowing a foreign refiner that is able to establish the quality of the gasoline it sold in the United States in 1990 to petition the EPA to establish an individual baseline if the refiner agrees to specific conditions aimed at ensuring its compliance. These are: (1) in the case of a state-owned or operated refinery, that it waive any defense of sovereign immunity in civil, criminal, or administrative enforcement proceedings; and (2) in all cases, that the refiner (a) appoint an agent for the service of process in Washington, D.C.; (b) post a substantial bond to ensure payment of penalties in the event of its noncompliance; (c) commit to allowing EPA inspections and audits of all gasoline produced, regardless whether it is intended for the U.S. market; (d) submit to the jurisdiction of United States courts or administrative tribunals in any enforcement action; (e) implement detailed tracking and certification procedures to ensure its compliance with EPA regulations; and (f) procure independent third-party sampling and laboratory tests. See 1997 Rule, 62 Fed.Reg. at 45,539-41, 45,550-59.
 
 
 35
 In effect, then, the agency presumes that foreign refiners will not have (or will not produce) the 1990 data necessary to establish an individual baseline; it then provides foreign refiners that do have those data with the option, subject to the conditions necessary to ensure their compliance with the agency's program, of petitioning for an individual baseline. In view of the evident likelihood that foreign refiners--even if willing--would be unable to produce the requisite data, and the significant jurisdictional obstacles to obtaining data from and enforcing compliance against the unwilling, we think the EPA's construction of § 7545(k)(8) is a reasonable one. That data with which to set an individual baseline merely "exist" in the abstract is meaningless, as the agency concluded, unless backed by adequate provisions for enforcing the refiner's compliance with that baseline.
 
 4. The Remedial Provision
 
 36
 Recall that the EPA provided for an automatic tightening of the statutory baseline for imported conventional gasoline in the event emissions per gallon of NOx ever exceed a benchmark representing the average quality of gasoline imported in 1990. See 1997 Rule, 62 Fed.Reg. at 45,537/2-3. Warren asserts the EPA has no authority to alter the statutory baseline set out in § 7545(k)(10)(B), to which the agency responds that § 7545(c)(1)(A) empowers it to do precisely that.
 
 
 37
 Under the latter provision, the EPA has broad authority to "control" the introduction into commerce of any motor vehicle fuel "if in the judgment of the Administrator any emission product of such fuel ... causes, or contributes, to air pollution which may reasonably be anticipated to endanger the public health or welfare." It is well-established that under this provision the EPA may control "fuels or fuel additive[s] already in commerce," API, 52 F.3d at 1121, which the agency has long done with respect to leaded gasoline. See Union Oil Co. v. EPA, 821 F.2d 678, 680 (D.C.Cir.1987); Amoco Oil Co. v. EPA, 501 F.2d 722, 744-46 (D.C.Cir.1974). The agency may also use the same authority to alter decisions made under other subsections of § 7545. See Ethyl Corp. v. EPA, 51 F.3d 1053, 1063-64, 1065 (D.C.Cir.1995) (explaining that under § 7545(c) EPA may control or prohibit a fuel additive previously waived into commerce under § 7545(f)).
 
 
 38
 Warren does not respond directly to the EPA's claim of authority under § 7545(c)(1)(A), but instead asserts that § 7545(k)(10)(B) specifies "exactly" what the statutory baseline for imported gasoline should be. That is neither formally nor functionally correct, however. Section 7545(k)(10)(B) refers not to gasoline that contains specific levels of pollutants but to gasoline that "meets the [listed] specifications"; as a matter of ordinary language, gasoline that exceeds those specifications necessarily also "meets" them. See AMERICAN HERITAGE DICTIONARY 1122 (3d ed.1992) (def. 11: "[t]o satisfy (a need, for example); fulfill: meet all the conditions in the contract"). Nor does anything in § 7545(k) suggest the Congress intended to limit the Administrator's broad authority under § 7545(c)(1)(A).
 
 
 39
 Warren next argues that the agency failed to satisfy a procedural prerequisite to regulation under § 7545(c)(1)(A): the Administrator may regulate a fuel under § 7545(c)(1)(A) only "after consideration of all relevant medical and scientific evidence available to [her], including consideration of other technologically or economically feasible means of achieving emission standards under section 7521 of this title [governing emissions controls on motor vehicles]." § 7545(c)(2)(A). This claim founders, however, upon Warren's own failure to show (indeed, even to attempt to show) that the alleged oversight was material to the Administrator's decision, as required by the Act. See § 7607(d)(8) ("In reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made"); § 7607(d)(1)(E) (making § 7607(d) applicable to rules regulating fuels under § 7545); Texas Mun. Power Agency v. EPA, 89 F.3d 858, 875 (D.C.Cir.1996) (under § 7607(d)(8) court may reverse only procedural errors that are material).
 
 
 40
 Accordingly, we hold that in enacting the remedial provision the EPA acted within its authority under § 7545(c)(1)(A), that such authority is not limited by § 7545(k)(10)(B), and that Warren's procedural challenge to the remedial provision is barred.
 
 5. Arbitrary and Capricious Challenges
 
 41
 The petitioners challenge the 1997 rule as arbitrary and capricious in seven respects. First, they argue the EPA has not provided a reasoned explanation for departing from its prediction in the 1994 rulemaking that the optional baseline approach would adversely affect the average quality of imported gasoline due to "gaming" by foreign refiners. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 57, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ("An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis"). In response, the EPA points out that it continued to recognize the possibility that gaming by foreign refiners might lessen air quality but concluded that this risk was not as great as the agency previously had thought; indeed, one of its basic assumptions in the 1994 rulemaking was contradicted by new data.
 
 
 42
 In 1994 the agency had simply assumed that refiners would supply the dirtiest gasoline allowed by law. See 1994 Rule, 59 Fed.Reg. at 7,785/1-2. In the 1997 rulemaking, however, the EPA noted that data collected under the 1994 rule showed that for imported gasoline in 1995 the volume-weighted average of exhaust toxics was significantly lower, and in the case of NOx was slightly lower, than both the statutory baseline and the volume weighted average for domestic individual baselines. See 1997 Rule, 62 Fed.Reg. at 45,542/2 & n.13. Those data corroborated data submitted by a major foreign supplier to the U.S. market showing its expected individual baseline for exhaust toxics would be cleaner than the statutory baseline. See id. at 45,542/2. The evidence therefore showed that although under the 1994 rule foreign suppliers were required only to meet the statutory baseline, they were in fact on average producing cleaner gasoline, apparently for other reasons. The facts having changed, the agency reasonably changed its position, as it explained at the time.
 
 
 43
 Second, and relatedly, the petitioners argue that the after-the-fact nature of the remedy is arbitrary and capricious because it allows air quality to degrade in the first place. The EPA says it was responding, however, to the uncertainties inherent in attempting to predict whether a future degradation of gasoline quality, should it occur, will be due to gaming by foreign refiners or to shifts in the composition of the market. (Obviously those foreign refiners that do not have the data to construct an individual baseline simply can not game the system; they do not have the option of petitioning for an individual baseline.) In monitoring the quality of imported gasoline the EPA will be using a three-year average in order to distinguish between these two possible causes; as the agency explained, a "change in average gasoline quality during any particular year ... might indicate the effects of allowing the option for individual baselines,* or it might reflect the unique circumstances [due to shifts in the market] for that year." Id. at 45,542/1.
 
 
 44
 The EPA further explained that any adverse impact upon the quality of conventional gasoline due to gaming by foreign refiners depends upon a host of factors, to wit:
 
 
 45
 the number of foreign refiners that receive an individual baseline, the actual individual baselines assigned to them, the volume of gasoline included in the individual baseline, the source and amount of conventional and reformulated gasoline imported each year, and the extent, if any, to which foreign refiners whose 1990 exports to the U.S. were cleaner on average than the statutory baseline would now ship gasoline that is dirtier than what they exported to the United States in 1990.
 
 
 46
 Id. at 45,560/3; see also id. at 45,537/2 (noting similar uncertainties); DOE Comments, 1997 Rulemaking, Pub. Dkt. No. A-97-26, IV-G-03, at 3 (filed July 8, 1997). It seems to us entirely reasonable for the EPA to plan now how it will deal with uncertain future developments but to delay remedial action until the need for any remedy is known. See North Carolina v. FERC, 112 F.3d 1175, 1190 (D.C.Cir.1997) ("In the face of 'serious uncertainties,' an agency need only 'explain the evidence which is available, and ... offer a rational connection between the facts found and the choice made' ") (quoting State Farm, 463 U.S. at 52, 103 S.Ct. 2856); see also NRDC v. Thomas, 805 F.2d 410, 425 (D.C.Cir.1986) (emissions averaging method reasonable even though it could lead to worse air quality under certain scenarios, because tradeoffs in terms of clean air objectives are difficult to predict).
 
 
 47
 Third, Warren argues it would be unfair for the EPA, by tightening the statutory baseline for NOx, to place upon importers such as itself the burden of compensating for the dirtier than average gasoline supplied by foreign refiners operating under individual baselines. As the agency explains, however, because gasoline supplied under an individual baseline necessarily reflects the quality of the supplying party's 1990 gasoline, any increase in emissions per gallon from foreign gasoline must be due to gasoline imported under the statutory baseline. Restating the argument in other terms, Warren claims importers and domestic refiners are similarly situated and must therefore be treated alike. Although Warren claims the EPA did not respond to this formulation of the point in its rulemaking, it is clear that the agency's response to the first formulation is equally applicable: because all domestic refiners have individual baselines, all gasoline supplied at the statutory baseline must be imported. Targeting this pool of gasoline, therefore, is not arbitrary and capricious; on the contrary, it is congruent with the statutory scheme permitting a refiner of dirtier than average gasoline in 1990 to continue, by establishing an individual baseline, selling gasoline at that standard.
 
 
 48
 Relatedly, Warren observes that if the statutory baseline is ever tightened, then more foreign refiners will have an incentive to apply for an individual baseline. This is likely true but it is no more arbitrary and capricious than the underlying decision, which we uphold, to place the remedial burden upon gasoline imported under the statutory baseline. Additionally we note the EPA has limited the volume of gasoline a foreign refiner may import under its individual baseline to the volume of gasoline it imported in 1990; gasoline in excess of that amount must comply with the presumably more stringent statutory baseline and therefore will not add to Warren's potential burden under a tightened statutory baseline. See 1997 Rule, 62 Fed.Reg. at 45,550/2 n.23.
 
 
 49
 Fourth, the IRC challenges the agency's reasoning that the mandatory baseline approach could cause adverse environmental effects because foreign refiners of cleaner gasoline might leave the U.S. market in response to the added compliance burdens entailed in having an individual baseline. The EPA explained that a mandatory baseline approach
 
 
 50
 might produce incentives that would tend to reduce the average quality of imported conventional gasoline. For example, gasoline from refiners with cleaner individual baselines would be measured against a more stringent baseline than under the [1994] rules, while gasoline from refiners with dirtier individual baselines would be measured against a less stringent baseline than under the [1994] rules. Additional costs would be associated with segregation, tracking, and other requirements.... To the extent these changes put refiners with clean individual baselines at an economic disadvantage compared to refiners with either the statutory baseline or an individual baseline dirtier than the statutory baseline, it could potentially push the supply of gasoline away from refiners with clean individual baseline.
 
 
 51
 Id. at 45,536/3. The IRC asserts that this reasoning is illogical because foreign refiners with a dirtier individual baseline bear the same compliance and tracking costs as those with a cleaner individual baseline; therefore, we are told, the two groups of refiners would be equally likely to abandon the U.S. market for one with lower transaction costs. It is common ground among all parties, however, that cleaner gasoline is more expensive to produce. Therefore, it is not irrational to believe that if all foreign refiners incur an increased cost, then the suppliers of cleaner gasoline among them, with their higher costs and therefore smaller profit margins, will be the first to leave the U.S. market. See PAUL A. SAMUELSON & WILLIAM D. NORDHAUS, ECONOMICS 138-44 (16th ed.1998) (because profit-maximizing firms will cease additional production when marginal cost exceeds price, firms with higher marginal costs will supply relatively fewer goods at a given price than competitors with lower marginal costs).
 
 
 52
 Fifth, the IRC contests the EPA's conclusion that because foreign refiners might abandon the U.S. market when faced with the significant additional transaction costs associated with individual baselines, mandating individual baselines for all foreign refiners could affect the price and supply of gasoline in the United States. The IRC claims this reasoning is equally applicable to domestic refiners. As the EPA explained in its rulemaking decision, however, and no petitioner contests, the 1994 rule mandating individual baselines for all domestic refiners "has been successfully implemented without significant disruptions to the supply or price of conventional gasoline." 1997 Rule, 62 Fed.Reg. at 45,545/3.
 
 
 53
 Sixth, the IRC claims that to allow foreign refiners the option to petition for an individual baseline discriminates arbitrarily against domestic refiners, which are not afforded that option. [Brief at 28] As the EPA explains, however, and as we have discussed (in part II.B.3, above), foreign refiners are situated differently from domestic refiners; the EPA can impose upon domestic refiners by force the conditions necessary to ensure compliance with individual baselines. Additionally, because it has determined domestic refiners have adequate and reliable data to establish individual baselines, to allow domestic refiners such an option would exceed the agency's authority under § 7545(k)(8)(A). See id. at 45,545/3 n. 18.
 
 
 54
 Lastly, the IRC claims that because the agency in 1994 allowed domestic refiners to establish individual baselines using post-1990 data to model 1990 production, see id. at 45,534/2, it "cannot be contended, as EPA did, that a foreign refiner could not construct its own Individual Baseline using post-1990 data and submit it to EPA for approval." The EPA does not respond to this argument in its brief, perhaps because the agency did not take the position attributed to it; rather, it concluded in 1994 that modeling the quality of overall gasoline refinery production in order to establish an individual baseline "will not work properly for some or most foreign refineries [because they] ship only a portion of their production to the U.S. market." 1994 Rule, 59 Fed.Reg. at 7,786/2. Accordingly, in the 1994 rule the agency declined to permit any foreign refiner to use post-1990 data to establish an individual baseline. Under the 1997 rule, the agency still presumes that foreign refiners will be unable to use such data, see 1997 Rule, 62 Fed.Reg. at 45,536/2, but it gives them the opportunity to try.
 
 
 55
 C. Procedural Challenge: Late-Filed Comments
 
 
 56
 The petitioners challenge the EPA's reliance upon comments filed by the DOE after the close of the comment period. The EPA argues that the court lacks jurisdiction over this claim because the IRC failed to exhaust its administrative remedies. Under the Clean Air Act the court may not consider a procedural claim unless it has been "raised with reasonable specificity" before the EPA, either "during the period for public comment" or in a petition for reconsideration. 42 U.S.C. § 7607(d)(7)(B); see Texas Mun. Power, 89 F.3d at 871.
 
 
 57
 In its notice of proposed rulemaking the EPA noted the DOE's concern, which the DOE had expressed informally, that the supply and therefore the price of gasoline could be adversely affected if the EPA were to mandate individual baselines for all foreign refiners. See 62 Fed.Reg. at 24,779/2. At the public hearing the IRC protested the lack of any data or analysis in the record to justify this concern. After the period for public comment the DOE submitted its analysis for the record. The IRC now claims its earlier objection to the lack of analysis somehow morphed into its current objection to the late filing of that analysis. The two points are clearly different, however. Consequently, the IRC's current challenge to the agency's reliance upon the DOE's late-filed comments is raised here for the first time, and for that reason barred.
 
 III. Conclusion
 
 58
 In summary, we hold that the EPA had authority to enact the optional baseline rule and, in view of the uncertainties inherent both in the anti-dumping provision of the Act and by extension in the agency's implementation of that provision, to provide a prospective remedy against possible degradation of air quality. We also hold the agency did not act arbitrarily and capriciously in enacting the rule, for it based its different treatment of importers, foreign refiners, and domestic refiners upon rational distinctions. Finally, we do not pass upon the petitioners' two procedural challenges to the rule; one has not been shown to be material and the other is raised here for the first time. Accordingly, the petitions for review are
 
 
 59
 Denied.
 
 
 
 *
 Section 7545(k)(8) provides:
 (A) In General
 [T]he Administrator shall promulgate regulations applicable to each refiner, blender, or importer of gasoline ensuring that gasoline sold or introduced into commerce by such refiner, blender, or importer (other than reformulated gasoline subject to the requirements of paragraph (1)) does not result in average per gallon emissions (measured on a mass basis) of (i) volatile organic compounds, (ii) oxides of nitrogen, (iii) carbon monoxide, and (iv) toxic air pollutants in excess of such emissions of such pollutants attributable to gasoline sold or introduced into commerce in calendar year 1990 by that refiner, blender, or importer.
 ....
 (E) Baseline for determining compliance
 If the Administrator determines that no adequate and reliable data exists [sic] regarding the composition of gasoline sold or introduced into commerce by a refiner, blender, or importer in calendar year 1990, for such refiner, blender, or importer, baseline gasoline shall be substituted for such 1990 gasoline in determining compliance with subparagraph (A).
 The statutory "baseline gasoline" referred to in § 7545(k)(8)(E) is set out in § 7545(k)(10)(B).
 
 
 *
 In quoting the EPA decisions, acronyms have been replaced with the terms they represent