United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued February 16, 1999 Decided March 26, 1999 

 No. 98-1082

 Louisiana Environmental Action Network and 

 Environmental Technology Council, Inc., 

 Petitioners

 v.

 United States Environmental Protection Agency, 

 Respondent

 American Petroleum Institute, et al., 

 Intervenors

 On Petition for Review of an Order of the 

 Environmental Protection Agency

 David R. Case argued the cause for petitioners. With him 
on the briefs was David J. Lennett.

 Mary F. Edgar, Attorney, U.S. Department of Justice, 
argued the cause for respondent. With her on the brief were 


Lois J. Schiffer, Assistant Attorney General, and Steven 
Silverman, Attorney, U.S. Environmental Protection Agency.

 William R. Weissman argued the cause for intervenor 
Edison Electric Institute, et al. With him on the brief were 
Steven J. Groseclose, George W. Frick, Ralph J. Colleli, 
David F. Zoll and Ronald A. Shipley.

 Before: Williams, Sentelle and Garland, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Williams.

 Opinion by Circuit Judge Sentelle, concurring in part and 
dissenting in part.

 Williams, Circuit Judge: Section 3004(m) of the Resource 
Conservation and Recovery Act ("RCRA"), 42 U.S.C. 
s 6924(m), requires the Environmental Protection Agency to 
promulgate regulations governing what treatment certain 
kinds of hazardous waste must undergo before it may be 
disposed of in a landfill. EPA found that waste already in a 
landfill presented a special problem. The agency's authority 
to compel high-quality disposition of such waste is not as 
great as it is for as yet undisposed of waste. As a result, too-
strict treatment regulations could in some circumstances dis-
courage excavation--and thus prevent any treatment at all. 
Because of its concern for this, EPA promulgated a regula-
tion under s 3004(m) allowing variances from generally appli-
cable treatment standards if "treatment to the specified level 
or by the specified method is environmentally inappropriate 
because it would likely discourage aggressive remediation." 
62 Fed. Reg. 64,509/3 (1997). Petitioners Louisiana Environ-
mental Action Network ("LEAN") and Environmental Tech-
nology Council ("ETC") petitioned for review of this new 
variance rule; we deny the petition to the extent it is ripe.

 * * *

 Standing first. Petitioners defend only the standing of 
LEAN; despite its participation in oral argument and evident 
interest in the case, ETC (a waste treatment company trade 
association formerly known as the Hazardous Waste Treat-

ment Council) appears to lack prudential standing. See, e.g., 
Hazardous Waste Treatment Council v. Thomas, 885 F.2d 
918, 925 (D.C. Cir. 1989) ("HWTC IV") (because of concern 
that "judicial intervention may defeat statutory goals if it 
proceeds at the behest of interests that coincide only acciden-
tally with those goals," firms selling environmental services 
lack standing to challenge RCRA regulations as insufficiently 
stringent); Hazardous Waste Treatment Council v. EPA 
("HWTC II"), 861 F.2d 277, 283 (D.C. Cir. 1988) (same). 
LEAN, by contrast, evidently an organization of environmen-
tally concerned citizens and groups, clearly meets prudential 
standing requirements. It rests its claim of "injury in fact" 
(essential for constitutional standing) on the interests of at 
least three members who live near the Carlyss landfill in 
Louisiana. This is the site at which most waste from that 
state would be "land disposed" if excavated and treated. 
Under LEAN's theory, "lower quality" (less treated) wastes 
will be deposited in Carlyss; the rule in literal terms permits 
that effect, and holders of hazardous waste have every incen-
tive to take advantage of it. Under EPA's theory the new 
rule will increase the quantity of waste disposed of at Carlyss, 
for it adopted the rule lest holders of hazardous waste who 
were free to choose would forego costly excavation and redis-
posal (with the likely destination, in Louisiana, of Carlyss) in 
favor of thriftier in-place solutions. Either way, application 
of the variance rule will lower the average quality of waste 
deposited at Carlyss, and under EPA's view its application 
will also increase the quantity of such waste. Thus, to the 
extent that there is any residual risk in the lower-quality 
wastes, application of the rule will increase the risk of harm 
to LEAN members living near Carlyss.

 While our partially dissenting colleague doubts that such 
harm is sufficiently imminent, we do not. Petitioners have 
noted that in the state of Louisiana there are over 100 
inactive or abandoned hazardous waste sites for which clean-
up has already been found necessary, as well as about thirty 
RCRA facilities designated "high priority." It is therefore all 
but certain that remediation activities will continue to occur 
apace. Even if the variance-to-remediation ratio is fairly low, 


the amount of such activities creates a very "substantial 
probability" that some variances will be granted, increasing 
risk to LEAN members near the Carlyss site. See Florida 
Audubon Society v. Bentsen, 94 F.3d 658, 666 (D.C. Cir. 
1996).

 What is novel here is that LEAN must surely have (indeed, 
counsel at oral argument confirmed that it did have) other 
members who live nearer to the landfills in which waste 
currently resides--waste that would, absent the waiver rule's 
preference for excavation, treatment and redisposal, remain 
in place and continue to entail some risk for these LEAN 
members. Indeed, as the waiver rule is aimed at "cases 
where imposition of the otherwise applicable treatment stan-
dard could result in a net environmental detriment by dis-
couraging aggressive remediation," 62 Fed. Reg. 64,505/3 
(1997) (emphasis added), these other members might well be 
harmed more by continuation of the status quo than those 
living near the Carlyss landfill are benefited.1

 We have previously held that such a conflict of interest 
within an organization does not deprive the organization of 
representative standing if no internal procedural violation has 
been shown. National Maritime Union v. Commander, 
Military Sealift Command, 824 F.2d 1228, 1232-34 (D.C. Cir. 
1987). But see Retired Chicago Police Ass'n v. City of 
Chicago, 76 F.3d 856, 864-65 (7th Cir. 1996) (as burden to 
show standing is on plaintiff, plaintiff organization must dem-
onstrate proper authorization of litigation if profound conflict 
of interest is present). Conceivably one might distinguish 
National Maritime Union on the ground that here we have 
an entity on the scene, ETC, with very real economic inter-
ests but no standing. The risk of some possible manipulation 

__________
 1 LEAN claims that it does not oppose EPA's decision to grant 
variances on the ground that the baseline requirement is so strin-
gent as to discourage aggressive remediation (e.g. excavation). But 
it does object to EPA's consideration of this excessive-stringency 
possibility in actually determining the content of a variance. Thus 
the outcome it seeks would likely be very similar to the status quo 
ante rule, i.e., standards that inhibit remediation.

will occur even to the most naive. Nevertheless, because of 
the line-drawing difficulties that any such distinction would 
generate, we believe that in the absence of any overt signal 
that LEAN's decision to challenge the rule is the product of 
ETC's influence, National Maritime Union should control.

 As LEAN's primary purpose is likely to protect the overall 
health of Louisiana's environment, one might question the 
organization's standing on germaneness grounds. See Hunt 
v. Washington State Apple Advertising Comm'n, 432 U.S. 
333, 343 (1977) ("the interests [the organization] seeks to 
protect [must be] germane to the organization's purpose"). 
But by LEAN's own description, "LEAN's purpose is to 
protect Louisiana's air, land, water, and other natural re-
sources, and to protect LEAN's members and other citizens of 
the state, from threats posed by pollution." Petitioners' 
Certificate as to Parties (emphasis added). Indeed, we see no 
reason to believe that LEAN's purposes are exclusively 
other-regarding. All non-trivial policy issues entail trade-
offs, and LEAN may legitimately object to decisions that 
injure its members' environmental interests, no matter what 
the overall calculus. That being the case, National Maritime 
Union controls this issue as well. Organizations, like people, 
may face the problem of "two souls in one breast," but--as 
long as they do not violate internal procedures--they are free 
to choose for themselves which purpose to pursue on any 
specific occasion. That LEAN may act against its other-
regarding purposes is no more a bar to standing than that it 
acts against the self-interest of some of its own members.

 * * *

 Section 3004(m)(1) provides, in relevant part, that

 the Administrator shall ... promulgate regulations spec-
 ifying those levels or methods of treatment, if any, which 
 substantially diminish the toxicity of the waste or sub-
 stantially reduce the likelihood of migration of hazardous 
 constituents from the waste so that short-term and long-
 term threats to human health and the environment are 
 minimized.


42 U.S.C. s 6924(m)(1).

 In the preamble to its new variance rule, EPA stated that 
in considering whether a particular variance complies with 
this language, it may consider "the risks posed by the contin-
uation of any existing land disposal of the untreated waste, 
that is, the risks posed by leaving previously land disposed 
waste in place." 62 Fed. Reg. 64,506/2 (1997). Further, in an 
apparent illustration of specific factors it might look to in 
selecting the right level for a specific variance, EPA men-
tioned "disposal of treatment residues in a subtitle C land-
fill"--that is, a landfill subject to the hazardous waste dispos-
al controls of RCRA s 3004 et seq. Id. LEAN argues that 
both considerations are improper under the statute.

 Whether EPA's words qualify as a "regulation" under 
RCRA's judicial review provision, 42 U.S.C. s 6976(a)(1) (pro-
viding review within 90 days of action promulgating "regula-
tion"), depends on three factors: EPA's own characterization, 
whether it published the language in the Federal Register or 
the Code of Federal Regulations, and whether the action has 
binding effect on either private parties or EPA. See Florida 
Power & Light Co. v. EPA, 145 F.3d 1414, 1418 (D.C. Cir. 
1998). (The first two factors are, of course, the best indica-
tion of the third.) The EPA argues that this is a reviewable 
"regulation" and has published the contested material in the 
Federal Register, and we see nothing in the actual language 
that would indicate that it intended something less than an 
official, binding interpretation of the statute.

 LEAN's challenge must also satisfy ripeness requirements. 
But as Congress has provided immediate review of RCRA 
regulations, see 42 U.S.C. s 6976(a)(1), we need only find that 
the issue is fit for judicial review. See George E. Warren 
Corp. v. EPA, 159 F.3d 616, 622 (D.C. Cir. 1998) ("Where the 
[fitness] prong of the Abbott Laboratories ripeness test is met 
and Congress has emphatically declared a preference for 
immediate review ... no purpose is served by proceeding to 
the [hardship] prong."). Fitness for judicial review is based 
on "whether the issue is purely legal, whether consideration 
of the issue would benefit from a more concrete setting, and 


whether the agency's action is sufficiently final." Id. at 621. 
With respect to these first questions--whether the statute 
entirely bars EPA from consideration of certain factors--all 
three criteria indicate fitness for review and, accordingly, 
ripeness.

 On the merits: in the words of Chevron, "the statute is 
silent or ambiguous with respect to the specific issue" of 
whether the "threats" to be "minimized" under s 3004(m) 
may include the threat posed by leaving waste where it 
currently is. Chevron v. NRDC, 467 U.S. 837, 843 (1984). 
LEAN's argument here appears to be that because s 3004(m) 
only regulates waste to be disposed of in new landfill sites (a 
point that is not disputed), it follows that the only "threats" to 
be considered and "minimized" are threats from waste in such 
a new site. This appears a complete non sequitur. It seems 
far more natural to suppose that in a statute enacted to 
protect human health and the environment, Congress intend-
ed to direct EPA to keep its eye on this underlying goal, 
rather than to use purely artificial benchmarks for inquiring 
whether threats are truly "minimized." Not only does the 
statute not resolve the specific issue contrary to EPA's 
resolution, but the latter is plainly reasonable in light of the 
statutory language and structure.

 We also find that Congress has not barred EPA, in its 
determination whether the "minimize[ ]" language is satisfied, 
from considering the protective effect of eventual disposal in 
a subtitle C landfill. LEAN's argument to the contrary 
depends on our decision in American Petroleum Institute v. 
EPA, 906 F.2d 729, 735-36 (D.C. Cir. 1990) ("API"). LEAN 
evidently reads this case to foreclose EPA from considering 
in any way the protective characteristics of the waste's place 
of ultimate deposit. But API held only that, because land 
disposal pursuant to s 3004(m)(2) is dependent upon compli-
ance with the s 3004(m)(1) treatment requirement, land dis-
posal itself cannot constitute the "treatment" required to 
satisfy s 3004(m)(1). Id. Thus, API makes clear that in 
measuring whether the "treatment" required will "substan-
tially diminish" toxicity or "substantially reduce" the likeli-
hood of migration, EPA must look to the (pre-disposal) 

treatment. EPA does not dispute this, even in the variance 
context. But as to whether EPA may look more broadly in 
determining if the overall effect is to "minimize[ ]" threats, 
API says nothing. Although LEAN points to another, later 
rulemaking in which EPA appears to have read the mandate 
of API more broadly, see 63 Fed. Reg. 28,607/3 (1998), a 
possible later error is no basis for us to upset the present 
rule.

 Nor do we find EPA's interpretation here unreasonable in 
light of the statute's language and structure. It would be 
senseless to make EPA, in attempting to protect human 
health and the environment, ignore the eventual disposal 
site's likely effect: such a restriction would deprive EPA of 
any basis from which to estimate the actual risk likely to be 
imposed on the outside world.

 We thus reject these challenges on the merits.

 * * *

 LEAN appears to make two additional challenges. It first 
claims that something in the present rule violates the "sub-
stantially diminish ... substantially reduce" language of 
s 3004(m)(1). But, apart from LEAN's claims as to what the 
statute categorically excludes from consideration in assessing 
the "minimiz[ation]" required by the section, the issue of 
whether a particular treatment brings about substantial dimi-
nution or reduction--although concededly a restriction on 
whatever treatment is approved--cannot be decided without 
particular challenged treatments before us. Accordingly, we 
find the issue unfit for judicial review at this time.

 LEAN next argues that EPA's risk calculations will be 
unfairly compromised by its improper refusal to exercise its 
power to force excavations of hazardous waste. But when 
prompted at oral argument, counsel for petitioners was un-
able to point to any language indicating EPA's intention to do 
such a thing, and counsel for EPA denied any such intent. 
We see no ripe case or controversy here.

 We dismiss these unripe challenges.

 * * *

 We find no reason to disturb EPA's decision. We dismiss 
the petition in part and deny the remainder.

 So ordered.

 Sentelle, Circuit Judge, concurring in part and dissent-
ing in part: I wholly concur in the portion of my colleagues' 
opinion and judgment that dismisses the diminution or reduc-
tion and risk calculation claims of Louisiana Environmental 
Action Network as unripe. As to the portion of the opinion 
denying the remainder of the petition, I do not disagree with 
their view of the merits; I simply do not think we can 
properly reach the merits at all. I am not at all convinced 
that petitioners have carried their burden of establishing that 
they have standing to challenge the RCRA regulations.

 In order to satisfy the "essential and unchanging" standing 
predicate to any exercise of the jurisdiction of an Article III 
court, a litigant must establish the "irreducible constitutional 
minimum of standing," by demonstrating that it has suffered 
a "concrete and particularized" injury that is (1) "actual or 
imminent," Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 
(1992), (2) caused by or fairly traceable to an action that the 
litigant challenges in the litigation, see Allen v. Wright, 468 
U.S. 737, 752 (1984), and (3) redressable by the court in the 
action, see Simon v. Eastern Ky. Welfare Rights Org., 426 
U.S. 38 (1976). We require a plaintiff or petitioner to show 
that the injury is current, or "at least imminent" in order to 
avoid the possibility that the court may be "unconstitutionally 
render[ing] an advisory opinion by 'deciding a case in which 
no injury would have occurred at all.' " Florida Audubon 
Soc'y v. Bensen, 94 F.3d 658, 663 (D.C. Cir. 1996) (quoting 
Defenders of Wildlife, 504 U.S. at 564 n.2). A speculation of 
harm is not sufficient to demonstrate the concrete, particular-
ized injury necessary for constitutional standing. Simon, 426 
U.S. at 44 ("[U]nadorned speculation will not suffice to invoke 
the federal judicial power.").

 That the current injury is speculative is demonstrated by 
the very terms in which it is expressed. As the majority 
describes the injury, the most that LEAN has demonstrated 
is that three of its members live near a site "at which most 
waste from [Louisiana] would be 'land disposed' if excavated 
and treated." Maj. op. at 3. The majority relies solely on 
the fact that there are approximately 100 sites in Louisiana 
for which cleanup has been found necessary as grounds for 


concluding that it is "all but certain that remediation activities 
will continue to occur apace." Id. From this conclusion, the 
majority opines that "[e]ven if the variance-to-remediation 
ratio is fairly low, the amount of such activities creates a very 
'substantial probability' that some variances will be granted." 
Id. at 3-4. However, neither the majority, nor anyone else, 
can say whether the variance-to-remediation level will be 
high, low, or even zero. The majority correctly concludes 
that the record evidence indicates that there is a "substantial 
probability" that remediation will occur in the future at sites 
in Louisiana. However, it improperly leaps from this well-
supported proposition to the wholly unsupported conclusion 
that, as part of any future remediation at sites in Louisiana, 
"some variances will be granted," adversely affecting the 
interests of the named LEAN members. Assent to this 
latter proposition requires a grand leap of faith since we can 
only speculate concerning whether EPA will grant variances 
for sites in Louisiana. Indeed, there is no record evidence 
indicating that any of the sites referenced by the majority 
would be suitable candidates for variances under EPA's new 
program, since EPA has not yet acted to grant or deny a 
single variance. For these reasons, I can only conclude that 
petitioners' alleged injury is speculative at best.

 The purely speculative variety of failed standing occurs 
most frequently where, as here, petitioners are attacking an 
action of an agency or other entity which they contend is 
likely to encourage some third party not before the court to 
take some action which would be detrimental to plaintiffs and 
might possibly occur if that third party acts upon the encour-
agement. The Supreme Court has discussed this proposition 
in a number of decisions, including Warth v. Seldin, 422 U.S. 
490 (1975). In Warth, the Court opined that in litigation 
challenging the governmental regulation of one party on the 
basis that it causes harm to a third party, "the indirectness of 
the injury does not necessarily deprive the person harmed of 
standing to vindicate his rights. But, it may make it substan-
tially more difficult to meet the minimum requirement of 
article III: to establish that, in fact, the asserted injury was 
the consequence of the defendants' actions or that prospective 


relief will remove the harm." Id. at 505. All the more 
difficult where, as here, it is speculative that the harm will 
occur at all. In Florida Audubon Society v. Bensen, 94 F.3d 
658 (D.C. Cir. 1996), we held that plaintiffs had not demon-
strated standing where they had not shown that it was 
substantially probable that the promulgation of the alleged 
incentive toward the third party would cause the speculated 
injury. Here there is no such showing and no standing.

 In short, I would hold that plaintiffs have not demonstrated 
that they meet the constitutional minimum of a concrete, 
particularized injury or that any such injury is caused by the 
acts of a defendant of which they complain. Instead of 
denying the petition, I would dismiss it.